vdecMAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2023 ME 43
Docket:      Wal-22-298
Argued:      May 10, 2023
Decided:     August 3, 2023

Panel:       STANFILL, C.J., and JABAR, HORTON, CONNORS, and DOUGLAS, JJ.

UPSTREAM WATCH

v.

CITY OF BELFAST et al.

JABAR, J.

[¶1]   Upstream Watch (Upstream) appeals from a judgment of the Superior Court (Waldo County, *R. Murray, J.*) affirming the Belfast Zoning Board of Appeals' (ZBA) decision dismissing Upstream's appeal on the grounds that Upstream did not have standing to appeal the Belfast Planning Board's (Planning Board) decision issuing five permits to Nordic Aquafarms (Nordic). We conclude that the ZBA erred as a matter of law when it determined that Upstream did not have standing to appeal. We vacate the judgment and remand the case to the Superior Court with instructions to remand the case to the ZBA.[1]

---

[1]  We note that although this case is closely related to our recent decision in *Mabee v. Nordic Aquafarms Inc.*, 2023 ME 15, 290 A.3d 79, the permits at issue here are distinct from those at issue in *Mabee*. While our decision in *Mabee* may have an effect on the ultimate viability of the permits at issue here, our ruling today relates only to a threshold standing issue. We remand the matter to the

## I. BACKGROUND

[¶2]  The following facts are drawn from the administrative record before the ZBA, the municipal body that issued the decision we now review.  *See Friends of Lamoine v. Town of Lamoine*, 2020 ME 70, ¶ 2, 234 A.3d 214.

[¶3]   Upstream is a not-for-profit corporation registered to transact business in Maine, with its principal place of business in Belfast, that is dedicated to the restoration of Maine mid-coast rivers and streams, including the Little River in Belfast, to their natural habitats.  Nordic is a Delaware corporation that has proposed a land-based salmon aquaculture project in Belfast at a site where U.S. Route 1 crosses the Little River.  On June 11, 2019, in furtherance of the project, Nordic submitted applications to the Planning Board for (1) a site plan permit, (2) a zoning use permit, (3) a shoreland zoning permit, (4) a significant groundwater wells permit, and (5) a significant water intake and significant water discharge/outfall pipes permit.

[¶4]  After Nordic submitted its permit applications, the Planning Board issued a procedural order requiring any person or entity who wanted to be included as a "Party-in-Interest" to file a written statement with the Planning

ZBA to address the merits of the permits, and we leave it to the ZBA to address the impact of our decision in *Mabee*.

Board on or before July 30, 2019. The procedural order required the written statement to demonstrate, inter alia, that the person or entity owned land directly or indirectly affected by the project and would suffer a "particular injury" distinct from the public because of the project. Upstream filed a written statement which demonstrated how it was affected by the project by explaining its purpose, listing its members whose property abutted the project, and describing the conservation easement over the intertidal land owned by other Upstream members that would be directly affected by the project.[2] Based on this written statement, the Planning Board granted Upstream party-in-interest status.

[¶5] Between June 2019 and December 2020, the Planning Board held twenty-two public hearings and thirty-nine public meetings on the project. Upstream participated in approximately twenty-two of these proceedings, expressing its opposition to the project. At the Planning Board proceedings, a representative for Upstream and several of Upstream's members testified, expressing concerns about the impact of emissions from the project, the odors and sounds from the project, the visual impact of the project on members'

---

[2] We adjudicated the issues surrounding the conservation easement and the ownership of the intertidal lands in *Mabee*, 2023 ME 15, 290 A.3d 79.

enjoyment of the environment, the project's impact on the environment itself, the project's impact on traffic, and the project's impact on groundwater and freshwater supplies. On December 22, 2020, the Planning Board voted to approve Nordic's permit applications. On January 20, 2021, Upstream timely appealed the Planning Board's decision to the ZBA. *See* Belfast, Me., Code § 102-134(a) (Dec. 7, 2004).

[¶6] As required by the Belfast Code of Ordinances Land Use Regulations Ordinance (Ordinance), Upstream completed the two-page application-to-appeal form to the ZBA. *Id*. A small space is provided on the first page for the applicant to describe the decision being appealed, the name and mailing address of the appealing party, and the type of review the party is requesting from the ZBA. The second page provides a list of prompts to describe the nature of the appeal and includes a few lines of blank space underneath each prompt. The first prompt reads, "Describe why you believe you have 'standing' to file an appeal." Upstream answered:

> Upstream Watch was qualified by the planning board as an "interested party" and participated fully in the planning board proceedings. Upstream Watch was formed to restore the Little River that abuts the project. Volunteers use the trails, the bay and the river.

[¶7]   At the ZBA's first hearing on Upstream's appeal, a ZBA board member questioned whether Upstream had standing to appeal.  Upstream's attorney explained to the ZBA the process the Planning Board used to determine who qualified as parties-in-interest, referencing the Planning Board's procedural order.  Upstream's attorney further explained that Good Karma Farm, owned by two Upstream members, is located about 600 feet from the project and may suffer potential injuries associated with monitoring its private wells and being forced to respond to any negative impacts to groundwater quality resulting from the project.  The ZBA requested that Upstream and Nordic submit briefs on the issue.

[¶8]   Both parties submitted briefs, and Upstream included affidavits from three of its members describing the potential injuries they may experience due to the project.  Upstream's brief and affidavits were dated February 25, 2021, more than thirty days after the appeals period, *see* Belfast, Me., Code § 102-134(a),[3] which had ended January 21, 2021.  The ZBA heard arguments from both parties.

---

[3] Belfast, Me., Code § 102-134(a) (Dec. 7, 2004) provides that "[a]n administrative appeal shall be taken within 30 calendar days from the vote taken by the board from which a party is aggrieved or the written decision of the code enforcement officer."

[¶9] After the arguments, the same member of the ZBA who raised the initial concern about Upstream's standing to appeal asked whether the ZBA could consider information submitted after the thirty-day filing deadline. While the affidavits submitted with the brief had been timely filed with the supplemental brief in accordance with the ZBA's request, they did fall outside the original thirty-day window to file an appeal. *Id*. The ZBA determined it should confine its review, and did confine its review, to Upstream's application-to-appeal form to determine whether Upstream had standing. The ZBA ultimately determined that Upstream had not demonstrated a particularized injury sufficient to establish standing and dismissed Upstream's appeal.

[¶10] Following the dismissal of its appeal, Upstream filed with the Superior Court a complaint for judicial review pursuant to Maine Rule of Civil Procedure 80B. The court dismissed Upstream's complaint, holding that the ZBA did not err when it determined that Upstream had failed to demonstrate administrative standing and therefore, Upstream failed to exhaust its administrative remedies because it did not file a cognizable appeal with the ZBA. Upstream timely appealed. M.R. App. P. 2B(a), (c)(1).

## II. DISCUSSION

[¶11]  We are faced with two issues: (1) whether the ZBA erred when it confined its review of whether Upstream had standing to the information contained on the application-to-appeal form and (2) whether, reviewing the entire record from the Planning Board, Upstream had standing to appeal the Planning Board's decision.[4]

### A. Standard of Review

[¶12]  "When the Superior Court acts as an intermediate court of appeals, we review directly the decision of the tribunal of original jurisdiction." *Nergaard v. Town of Westport Island*, 2009 ME 56, ¶ 11, 973 A.2d 735.  Because the question of whether a party has standing to bring an administrative appeal depends on the language of the governing ordinance, we must interpret and apply the relevant sections of the Ordinance.  *Id.* ¶ 12.

[¶13]  We review the interpretation of an ordinance de novo, *id.*, but will "accord substantial deference to the [tribunal of original jurisdiction's] characterizations and fact-findings as to what meets ordinance standards,"

---

[4] Upstream also contends that it was denied due process by the ZBA's proceedings and that the ZBA failed to make specific findings of fact and conclusions of law.  Because we conclude that the ZBA erred as a matter of law due to its confined review, we need not reach Upstream's additional arguments.  *See State v. Boilard*, 488 A.2d 1380, 1386 (Me. 1985) (declining to reach additional claims after reaching a dispositive conclusion on different grounds).

8

*Bizier v. Town of Turner*, 2011 ME 116, ¶ 8, 32 A.3d 1048 (quotation marks omitted). We examine "the plain meaning of the language of the ordinance, and we construe its terms reasonably in light of the purposes and objectives of the ordinance and its general structure," *Stewart v. Town of Sedgwick*, 2002 ME 81, ¶ 6, 797 A.2d 27, "to avoid absurd or illogical results," *Olson v. Town of Yarmouth*, 2018 ME 27, ¶ 16, 179 A.3d 920.

## B.     ZBA Appeals Process

[¶14]  "The [ZBA] shall review administrative appeals from final written decisions of . . . the Planning Board."  Belfast, Me., Code § 102-132(a) (Oct. 21, 2008).  The ZBA accepts appeals filed within thirty calendar days from the vote "taken by the board from which a party is aggrieved." *Id.* § 102-134(a).  "Forms for appeal shall be those approved by the [ZBA], and the aggrieved person shall set forth on said forms the grounds for the appeal." *Id.*  "All appeals shall be considered filed at the time of delivery to the City department of planning and community development . . . ." *Id.*  Additionally, "[i]n all administrative appeals, . . . the [ZBA] shall act as an appellate board which shall entertain all evidence of record submitted in the underlying hearing, including any transcripts, findings of facts, and decisions made by the board of original fact-finding jurisdiction." *Id.* § 102-134(f).

[¶15]   The Ordinance permits the ZBA to determine standing as an operative decisionmaker; however, the determination must be made "by a vote of a majority of a quorum of the [ZBA] members as a preliminary matter to the extent that any party's standing is challenged." *Id.* § 102-134(b).  Only parties with standing are permitted to participate in ZBA hearings. *Id.*

## C.   Administrative Standing

[¶16]  Under the Ordinance, an "aggrieved party" who may bring a case before the ZBA is "[a] person whose land is directly or indirectly affected by the granting or denial of a permit or variance . . . or a person whose land abuts land for which a permit or variance has been granted."  Belfast, Me., Code § 66-1(c) (Apr. 6, 2010).

[¶17]  The Ordinance does not define "abuts" or "abutter." *See id.*  We have ruled that in the absence of ordinance language to the contrary, "abutter" means a person who possesses land in close proximity to an affected piece of land, and thus is not limited to a direct abutter or adjoiner. *See Sahl v. Town of York*, 2000 ME 180, ¶ 9, 760 A.2d 266; *Brooks v. Cumberland Farms, Inc.*, 1997 ME 203, ¶¶ 2, 9-10, 703 A.2d 844; *see also Nergaard*, 2009 ME 56, ¶ 18, 973 A.2d 735 ("[S]tanding has been liberally granted to people who own property

in the same neighborhood as the property that is subject to a permit or variance.").

[¶18] The Ordinance defines a "person," and thus someone who may be an aggrieved party, *see* § 102-134(a), as including "an association" or "organization" as well as "an individual," § 66-1(b)(5). We have concluded, in the absence of contradictory language in an ordinance, that a group may show standing if at least one member has standing. *Friends of Lincoln Lakes v. Town of Lincoln*, 2010 ME 78, ¶ 15, 2 A.3d 284. Therefore, to establish standing under the Ordinance, Upstream had the burden of demonstrating that at least one of its members is an aggrieved person in the member's own right.[5]

### 1. The ZBA's Confined Review

[¶19] We consider de novo the ZBA's decision to confine its review of the facts contained in the application-to-appeal form because it involves a legal interpretation of the Ordinance. *See Nergaard*, 2009 ME 56, ¶ 12, 973 A.2d 735. The ZBA erred when it confined its review of Upstream's standing argument to

---

[5] Generally, associational standing includes three elements. "An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Black v. Bureau of Parks & Lands*, 2022 ME 58, ¶ 29, 288 A.3d 346 (quotation marks omitted). Because we determine that Upstream meets all three prongs, we need not decide whether only the first prong applies, or all three prongs apply, when determining whether an entity has associational standing in the administrative law context.

Upstream's written response on the application-to-appeal form because (1) the Ordinance does not contain such a restriction and (2) the Ordinance mandates that, when acting in an appellate capacity, the ZBA consider all evidence of record submitted in the underlying hearing. *See* § 102-134(f).

[¶20]  While the Ordinance does include two provisions governing the scope of the ZBA's review, neither provision expressly restricts the ZBA from considering the administrative record, including the Planning Board record. *See* § 102-134(f), (g).  To the contrary, the Ordinance mandates that when the ZBA acts in its appellate capacity, it "shall entertain all evidence of record submitted in the underlying hearing, including any transcripts, findings of fact, and decisions made by the board of original fact-finding jurisdiction." § 102-134(f); *cf.* M.R. Civ. P. 80B(e)-(f) (limiting the contents of, and the court's review of, the record).  Although the ZBA was making a standing determination in the first instance, it was considering this appeal from the Planning Board in its appellate capacity, and the ZBA should have used the administrative record, including the Planning Board record, to determine whether Upstream had standing. *See* § 102-134(f); *Norris Fam. Assocs., LLC v. Town of Phippsburg*, 2005 ME 102, ¶ 20, 879 A.2d 1007 (determining party's standing from Planning Board record); *Witham Fam. Ltd. P'ship v. Town of Bar Harbor*, 2011 ME 104,

¶¶ 12-13, 30 A.3d 811 (same). Therefore, the ZBA should not have confined itself to a review of the application-to-appeal form because the Ordinance does not contain such a restriction and mandates the ZBA to consider the entire record when acting in an appellate capacity.

### 2. Upstream's Standing

[¶21] We normally review with deference a municipal board's factual determinations, *see Bizier*, 2011 ME 116, ¶ 8, 32 A.3d 1048, but the facts contained in the administrative record here clearly establish Upstream's status as an aggrieved person as a matter of law. *See Black v. Bureau of Parks & Lands,* 2022 ME 58, ¶ 26, 288 A.3d 346 ("We review standing de novo as a question of law and may raise the issue sua sponte; therefore, we are not bound by the trial court's conclusion.").

[¶22] The parties and the ZBA agree that to have standing, Upstream had to demonstrate that it was an aggrieved person under the Ordinance. *See* §§ 66-1(c), 102-134(a). In determining that Upstream did not have standing, the ZBA applied both the aggrieved person standard contained in the Ordinance and a particularized injury standard.

[¶23] We look first to the plain language of the Ordinance. While it does mention standing generally, it does not explicitly require that a party show a

particularized injury to qualify as an aggrieved party. *See* §§ 66-1(c), 102-134; *Stewart*, 2002 ME 81, ¶ 6, 797 A.2d 27; *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 9, 953 A.2d 378 ("Whether a party has standing depends on the wording of the specific statute involved."). In *Nergaard,* the town's ordinance did not contain the same language present in the Ordinance. 2009 ME 56, ¶ 13, 973 A.2d 735. In *Nergaard*, we analyzed a particularized injury requirement when determining whether the plaintiffs had standing because the ordinance at issue defined "aggrieved party" as

> an owner of land whose property is directly or indirectly affected by the granting or denial of a permit or variance under [the applicable] Ordinance; a person whose land abuts land for which a permit or variance has been granted; or any other person or group of persons who have suffered *particularized injury* as a result of granting or denial of such a permit or variance.

*Id*. (emphasis added) (quotation marks omitted). The plaintiffs in *Nergaard* could not argue that they were abutters nor that they had land affected, which meant they could demonstrate that they were aggrieved parties only if they suffered a particularized injury. *Id.* ¶ 16. The Ordinance does not define "aggrieved party" as any person who has a particularized injury. *See* § 66-1(c). Unlike the ordinance at issue in *Nergaard*, the term "particularized injury" does not appear anywhere in the Ordinance. *See* §§ 66-1(c), 102-134 (containing no particularized injury requirement); *Nergaard*, 2009 ME 56, ¶¶ 13, 17-22, 973

A.2d 735 (analyzing the particularized injury requirement in the ordinance at issue).

[¶24] We require particularized injury for *judicial* standing, but a municipality can set its own more liberal rules for *administrative* standing. *Cf. Rockland Plaza Realty Corp. v. City of Rockland*, 2001 ME 81, ¶ 6, 772 A.2d 256 (discussing an ordinance provision that allowed for administrative review prior to an agency taking a final action). Any confusion in the case law arises from the fact that most ordinances incorporate a particularized injury requirement. For example, in *Nergaard*, the relevant ordinance expressly incorporated a particularized injury requirement into its definition of an "aggrieved party" where a party, like the plaintiffs in *Nergaard*, did not possess land that was affected by or abutted a permit or variance. 2009 ME 56, ¶ 13, 973 A.2d 735. This conclusion is reinforced by language in *Friends of Lincoln Lakes*, which states that in *Nergaard*, "a recent decision interpreting an ordinance containing identical language, we held that to establish standing the plaintiff 'must demonstrate not only that he or she had party status at the administrative proceedings, but, *in addition,* that he or she has suffered a particularized injury or harm.'" *Friends of Lincoln Lakes*, 2010 ME 78, ¶ 11, 2 A.3d 284 (quoting *Nergaard*, 2009 ME 56, ¶ 16, 973 A.2d 735). We viewed the

particularized injury requirement as incorporated in the specific language of that ordinance. It would make no sense for us to impose a particularized injury requirement for administrative standing when an ordinance itself does not include such a requirement, because nothing in any statute requires it.

[¶25] Another source of confusion may be the fact that we can, and do, impose a particularized injury standard for a plaintiff to seek redress in court. *See Dubois v. Town of Arundel*, 2019 ME 21, ¶ 6, 202 A.3d 524 ("In order to have standing to file a Rule 80B complaint, the complainant must show (1) that it was a party at the administrative proceeding, and (2) that it suffered a particularized injury as a result of the agency's decision." (quotation marks omitted)). This judicial restriction effectively limits judicial review under Maine Rule of Civil Procedure 80B to those aggrieved persons, however defined by an ordinance, who have a particularized injury. But here, that judicial standing restriction is immaterial because no one is arguing that Upstream does not have a particularized injury "as a result of the agency's decision" to appeal in court. *Dubois*, 2019 ME 21, ¶ 6, 202 A.3d 524.

[¶26] Here, upon examining the entire administrative record, we conclude, as a matter of law, that Upstream satisfies the definition of "aggrieved party" under the Ordinance. *See* § 66-1(c); *Black*, 2022 ME 58, ¶¶ 28-30, 288

A.3d 346. The proceedings from the Planning Board, contained in the administrative record available to the ZBA, demonstrate that at least one of Upstream's members was an aggrieved person, either as an abutter or as a possessor of land directly affected by the project. A number of Upstream's members owned property next to or near enough to the project to qualify as abutters, making them aggrieved parties under the Ordinance. § 66-1(c); *see Nergaard*, 2009 ME 56, ¶ 18, 973 A.2d 735. Additionally, the administrative record reflects that Upstream presented a number of concerns at Planning Board hearings sufficient to demonstrate that at least one of its members was an aggrieved person due to owning land that would be directly affected by the project, such as the potential impact that the project's drawing large amounts of water from a local aquifer could have on members' wells that draw water from that aquifer, *see Norris Fam. Assocs., LLC*, 2005 ME 102, ¶¶ 19-20, 879 A.2d 1007 (determining that abutters had standing to challenge potential construction that might displace water and redirect it onto other properties), the potential impact of the project on members' actual enjoyment of the local environment, *see Fitzgerald v. Baxter State Park Auth.*, 385 A.2d 189, 196-97 (Me. 1978) (holding that users of public land had standing to challenge an agency's action), and the potential impact of the project on local traffic, *see Sahl*,

2000 ME 180, ¶ 10, 760 A.2d 266 (conferring standing to appellants claiming that a motel expansion would obstruct their view and create additional traffic). *See* § 66-1(c).

[¶27]  Our review establishes that the administrative record clearly demonstrates as a matter of law that at least one of Upstream's members was an aggrieved person.  Accordingly, Upstream had standing to appeal to the ZBA and the ZBA erred in dismissing Upstream's appeal for lack for standing.

### III.  CONCLUSION

[¶28]  We conclude that the ZBA erred when it dismissed Upstream's appeal for lack of standing because it should not have confined its review to Upstream's application-to-appeal form.  We further conclude that, as a matter of law, the administrative record sufficiently demonstrates that Upstream had standing to appeal to the ZBA.  We vacate the decision of ZBA and remand to the Superior Court with instructions to remand to the ZBA for consideration on the merits of Upstream's appeal from the Planning Board decision.

The entry is:

> Judgment vacated.  Remanded to the Superior
> Court with instructions to remand to the ZBA for
> proceedings consistent with this opinion.

18

David B. Losee, Esq., David B. Losee LLC, Camden; and David J. Perkins, Esq. (orally), and Robert J. Papazian, Esq., Curtis Thaxter LLC, Portland, for appellant Upstream Watch

Kristin M. Collins, Esq. (orally), Preti Flaherty Beliveau & Pachios LLP, Augusta, for appellee City of Belfast

David M. Kallin, Esq. (orally), and Grady R. Burns, Esq., Drummond Woodsum, Portland, for appellee Nordic Aquafarms Inc.

Waldo County Superior Court docket number AP-2021-03
For Clerk Reference Only